FILED

2012 Mar-30  PM 12:01
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **STACY LANET WORD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:10-cv-1149-AKK** |
| **BELLSOUTH** | ) | |
| **TELECOMMUNICATIONS, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the court is BellSouth Telecommunications, Inc.'s ("Defendant")

motion for summary judgment, supporting briefs, and evidentiary submissions.

Docs. 22, 23, 24.  Stacy Lanet Word ("Plaintiff") has responded, docs. 26, 27, 29,

and Defendant has replied, doc. 30.  Accordingly, this matter is ripe for resolution.

For the reasons stated more fully herein, the court **GRANTS** Defendant's motion.

## I.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  To

support a summary judgment motion, the parties must cite to "particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c).  Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v.*

*England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald*

*Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's

position will not suffice; there must be enough of a showing that the jury could

reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.

1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

On July 8, 2002, Defendant hired Plaintiff as a Collections Representative

in its Birmingham, Alabama Operations Center.  Doc. 24-1 at 9; Word depo. at 27-

28.  Two years later, on June 30, 2004, Defendant "surplused" Plaintiff, *id*. at 9,

Word depo. at 28, but rehired her in 2005 in Small Business Collections in its

Huntsville, Alabama location, *id*. at 10, Word depo. at 30.  On April 24, 2006,

Plaintiff received a sales associate position in Birmingham, Alabama and remained

in that position until Defendant discharged her on August 12, 2009, for an

attendance infraction.  *Id*. at 10; Word depo. at 31.

Throughout Plaintiff's employment, Defendant utilized the AT&T

Attendance and Punctuality Guidelines ("the Guidelines"), which provide, in

relevant part:

───────────────

[1]The facts below are undisputed except as otherwise indicated.

3.01   AT&T Southeast has no program for planned absences and does not have a certain number of days set aside for each employee as sick days.  The Company expects employees to be at work every scheduled day.  Good attendance is a job requirement employees are expected to meet just as they meet other job requirements.

3.06   It has long been the policy of our Company that absenteeism problems are to be dealt with on an individual employee basis and that no rigid standards or criteria should be established to define how much absence is excessive or what fixed number of absences within a given period would result in some form of disciplinary action.  It is not the policy of the Company to use standards and/or a formula method for the evaluation of an employee's absence record.  Those supervisors closest to the problem can best handle attendance matters by applying reasonable criteria and using management discretion when taking disciplinary action.

8.07L. Miscellaneous Paid Absence
       Covers paid absence time when an employee is not at work due to legal or personal obligations that are primarily beyond their control.  The Company has a contractual and/or legal obligation to excuse employees with pay for certain circumstances.

8.14   Occurrences
       Occurrences are associated with summarized absence codes.  If an absence is broken by work time, the absence time is counted as a different occurrence.  Supervisors/designees are responsible for the tracking of occurrences.

9.03F.  Measure of Absenteeism
       The most useful measurement is the absentee rated expressed as a percentage (days absent divided by days scheduled).  By days scheduled, we include all days the employee was scheduled or would have been schedule had it not been for his[/her] absence.

9.09   Suspension (*letter in lieu of*)
This step is taken only after employees fail to demonstrate substantial improvement in response to previous counseling and warning steps.  The purpose of a *letter in lieu of* suspension is to demonstrate to the employees that their job is in jeopardy because of poor attendance.

Before this step is taken, the total situation should be re-examined.  The supervisor should:
A.   Ensure that the employee has been adequately warned.
B.   Compare the employee's record with other "poor performers" in the work group or office to be sure that he/she is not being treated unfairly in relation to others.
C.   Determine if the employee had adequate time to show improvement since the warning.
D.   Evaluate the occurrences of absence that prompted the decision to suspend the employee, i.e., were the absences totally unrelated to any of his/her other absences?

Doc. 24-8 at 7, 8, 31, 37, 41, 46-47 (emphasis in original).

Under the Guidelines, AT&T used reporting codes to "assist in accurately reporting absences."  Doc. 24-8 at 2.  A reporting code is required for any absence, regardless of the reason.  Doc. 24-8 at 13.  However, some absences, like FMLA approved absences, "are not summarized, which means that they are not considered in an employee's total absence."  Doc. 24-8 at 33, 36.  Moreover, Defendant used the following progressive disciplinary steps to address attendance problems:  informal discussion, counseling, warning, suspension, and discharge. Doc. 24-8 at 43-48.  For employees, such as Plaintiff, covered by Defendant's

collective bargaining agreement ("CBA") with the Communications Workers

Association ("CWA" or "the Union"), Defendant removed counseling entries after

six months, warnings after twenty-four months, and all remaining entries after

thirty-six months, provided there are no intervening disciplinary actions.  Doc. 27

at 26.

## A.    First Discharge

As it relates to this lawsuit, Defendant disciplined Plaintiff initially for

unsatisfactory attendance on July 17, 2007 (counseling), doc. 24-2 at 33, and

September 18, 2007 (warning), doc. 24-2 at 34.[2]  Thereafter, Plaintiff incurred

attendance infractions again on November 2, 2007, November 13, 2007, March

29, 2008, and May 5, 2008.  Doc. 26 at 4 ¶ 19.  Consequently, on June 23, 2008,

Defendant issued Plaintiff a suspension letter ("SL") disciplinary action and

advised Plaintiff that "unless improvement to a satisfactory level is made and

sustained over a reasonable period of time, your employment . . . will be

terminated."  Doc. 24-2 at 36; doc. 24-1at 13, Word depo. at 44.  Plaintiff filed a

grievance challenging the SL and, on July 22, 2008, after a grievance meeting

between Plaintiff, the CWA Union Representative, Ronald Reese ("Reese"), and

---

[2]Plaintiff received also a January 11, 2008, suspension letter that she claims "was never shown or given" to her.  Doc. 29 at 13, ¶37-38.  Defendant claims that it "inadvertently dated January 11, 2008, instead of June 23, 2008," the suspension letter in question.  Doc. 24-7 at 10.

Plaintiff's supervisor, Cureaka Coleman ("Coleman"), Coleman agreed to remove the SL within six months <u>if</u> Plaintiff maintained satisfactory attendance.[3]  Doc. 24-6 at 24; doc. 24-1 at 14, Word depo. at 48.  Also, allegedly, Coleman agreed not to penalize Plaintiff for upcoming absences to attend court hearings regarding her son.  Doc. 24-1 at 14, Word depo. at 48.

After the SL, Plaintiff missed work on several occasions:  (1) June 27, 2008, for four hours, doc. 26 at 8; (2) August 4, 2008, for a summons to appear in Jefferson County Family Court, *id*., doc. 24-6 at 23; (3) November 12, 13, and 14, 2008, which Plaintiff claims Defendant approved as FMLA leave, doc. 24-1 at 18, Word depo. at 62-63; doc. 26 at 8; (4) November 19, 2008, for a non-summons Family Court appearance, doc. 24-4 at 38; and (5) December 8, 2008, for a summons to appear in Family Court, doc. 24-4 at 39.  As a result, on December 9, 2008, Coleman discharged Plaintiff for unsatisfactory attendance.  Doc. 24-1 at 17; Word depo. at 60.

That same day, Plaintiff filed a grievance, doc. 24-2 at 41, claiming, in part, that Coleman failed to "advise [her] that she needed to bring back a subpoena to get an excused absence for her court appearances until after the November 19,

---

[3]Under the CBA, SLs remain on an employee's record for thirty six months and then roll off if there are no intervening infractions during that thirty six month period.  Doc. 27 at 6.

2008 court appearance." Doc. 29 at 8. On June 22, 2009, at the step three level of

the grievance process, the CWA State Representative, M.M. Smith ("Smith"),

accepted Defendant's offer to

> change [Plaintiff's] termination to a 30 day suspension entry, remove
> the suspension in lieu letter dated 06-23-2008, change coding from
> "H" to "excused unpaid" for time out on 11/19/08 & 12-08-08.
> [Defendant] additionally agrees without prejudice to provide grievant
> with refresher training upon return with a return date of 06-29-09 and
> pay 3 days pay less applicable taxes, etc.

Doc. 24-2 at 41-42; 24-11 at 20. Smith and Mary Fran Tulley, Defendant's Lead

Labor Relations Manager, signed the agreement. Doc. 24-2 at 41.[4]

Sometime afterwards, Smith informed Plaintiff of the decision to reinstate

her and the terms of her reinstatement. Plaintiff claims that Smith explained that

her suspension was "administrative" to allow Plaintiff to retain her seniority and

benefits. Doc. 24-1 at 27; Word depo. at 97-98. Plaintiff concluded that

"administrative" meant a non-disciplinary suspension, i.e., one that did not count

against her going forward. In any event, rather than rushing back to work since,

after all, Plaintiff had not worked since December 9, 2008, Plaintiff asked Smith

instead if

> he would ask the company if [she] could come back at a later date

---

[4]As part of the grievance settlement, Defendant did not require Plaintiff to release her
claims. Doc. 24-1 at 28; Word depo. at 104.

> because [Plaintiff] knew August 3rd through August 7th there was
> something that [Plaintiff] had to do that could not be changed.
> [Smith] said, . . . I can ask, but its going to look bad.  You've been off
> work for this much time.  The company is giving you your job back.
> Why don't you just go back to work, use vacation days, and things
> like that.  And [Plaintiff] said, you're right, I really need the money.  I
> can use my vacation days.

Doc. 24-1 at 28; Word depo. at 101.  Smith followed up the conversation with a

letter to Plaintiff on June 26, 2009, in which he mirrored verbatim the terms of the

reinstatement.  Doc. 24-2 at 43.  Thereafter, Reese called Plaintiff and instructed

her to report to work on Monday, June 29, 2009.  Doc. 24-1 at 27; Word depo. at

98.

## B.    Second Discharge

After Plaintiff returned to work on June 29, 2009, doc. 24-1 at 32; Word

depo. at 117-18, she made "several requests" to take vacation August 3-7, 2009,

but did not fill out a vacation request form because she was not "in the system,"

doc. 24-1 at 33; Word depo. at 124, and, therefore, did not get those days

approved, doc. 24-1 at 34, Word depo. at 126; *see also* doc. 24-7 at 16, ¶56.

Nevertheless, just a month after her reinstatement, Plaintiff called in each day the

entire week of August 3, 2009, to report that she would miss work for personal

reasons.  Doc. 24-1 at 34; Word depo. at 126-27.

To no surprise, Defendant noticed.  After Plaintiff called to report out again

on day two, Steve Wadley ("Wadley"), Senior Quality/M&P/Process Manager,

emailed Reese, the CWA representative, to inform him that Plaintiff had "reported

out" on August 3 and August 4, and that "[a]ny assistance [Reese] can provide in

reinforcing the need for her to improve her attendance to a satisfactory level would

be appreciated."   Doc. 24-8 at 60.   Reese apparently relayed the concerns to

Smith, the CWA state representative, who then on Wednesday or Thursday of that

same week, called Plaintiff and stated, "What's wrong? [ ] [Wadley] is calling

around, he's going to fire you.  What are you doing?"  Doc. 24-1 at 33; Word

depo. at 123.  Plaintiff responded

> remember, I told you this.  You know, I asked you this. [Smith] said
> why you didn't use vacation.  I said I ain't in the – I wasn't in the
> system in time to put in for vacation, but I asked on several different
> occasions from day one.  And he said, okay, well, let me call Fran and
> get these days changed to vacation . . . .

*Id*. On Thursday, August 6, 2009, Wadley and Reese had a conversation about

Plaintiff's continued absences, and on August 8, 2009, Wadley emailed Reese

stating, "When I talked to you Thursday I advised you I did not plan to terminate

[Plaintiff] upon her return.  Since she called out again Friday the discipline

decision is being reviewed."  Doc. 24-8 at 62.

  Thereafter, Wadley discussed the absences with Human Resources, Labor

Relations, and his immediate supervisor and obtained approval to discharge

Plaintiff for unsatisfactory attendance.  Doc. 24-7 at 6-7.  Plaintiff finally returned

to work on August 10, 2009, and Defendant informed her of the discharge on

August 12, 2009.  Doc. 24-1 at 35; Word depo. at 130.  Although Plaintiff filed a

grievance challenging the discharge, the CWA declined to arbitrate it.  Doc. 24-2

at 52; doc. 24-1 at 35,Word depo. at 131.

## C.      Charge of Discrimination and Complaint

On June 4, 2009, approximately three weeks before her reinstatement,

Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge,

alleging retaliation and discrimination based on race and color, in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"),

and violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

*et seq*.  Doc. 24-2 at 39.  Plaintiff never amended her charge to challenge her

August 12, 2009, discharge.  Doc. 24-1 at 19; Word depo. at 68.  In any event, the

EEOC issued Plaintiff a Dismissal and Notice of Rights on February 1, 2010.

Doc. 24-2 at 40.

Plaintiff filed this lawsuit on May 3, 2010, alleging retaliation and race and

color discrimination, in violation of Title VII and Section 1981, 42 U.S.C. § 1981,

and violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et*

*seq.*, and the ADA.  *Id*.  Doc. 1.[5]  Specifically, Plaintiff contends that Defendant

(1) retaliated against her for challenging alleged discrimination by discharging her

on August 12, 2009; (2) discriminated against her by discharging her on December

9, 2008, failing to promptly rehire her, and by discharging her again on August 12,

2009, after only "one occurrence;" (3) violated the FMLA by requiring her to

return to work before the expiration of her FMLA approved leave, issuing her a

SL when she returned to work from FMLA approved leave, and counting FMLA

approved days against her to support disciplinary actions, including discharge; and

(4) violated the ADA by denying her a reasonable accommodation.  Doc. 6.

## III.  ANALYSIS

The court turns now to Defendant's motion for summary judgment, in which

Defendant contends that Plaintiff cannot establish a prima facie case for any of her

claims and that, even if she can, it has legitimate, non-discriminatory reasons for

the employment actions Plaintiff challenges.  Doc. 22.  In Section A., the court

addresses Plaintiff's retaliation claim, the race and color discrimination claims in

Section B., the FMLA claims in Section C., and, finally, the ADA claim in section

D.  For the reasons stated fully below, Defendant is entitled to summary judgment

---

[5]Plaintiff filed an Amended Complaint on June 4, 2010, doc. 4, and a Second Amended Complaint on June 21, 2010, doc. 6.

on all of Plaintiff's claims.

## A.      Title VII and Section 1981 Retaliation

The analysis for retaliation under Title VII and Section 1981 is the same. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir 1998). Therefore, the court "shall explicitly address the Title VII claim with the understanding that the analysis applies to the §1981 claim as well." *Id*.  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race [or] color." 42 U.S.C. §2000e-2(a)(1).  Title VII also makes it unlawful for an employer to retaliate against an employee for participating in statutorily protected activity. *Id*. at 3(a).  To establish a prima facie case of retaliation, the plaintiff must show that:  (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (citation omitted).  A causal nexus exists if the plaintiff shows that "the decision-makers were aware of the protected conduct" and "the protected activity and the adverse [employment] action were not wholly unrelated." *McCain v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quotation marks and citations omitted), *cert. denied*, 555 U.S. 944

(2008).  "[C]lose temporal proximity may be sufficient to show that the protected activity and adverse [employment] action were not wholly unrelated."  *Id.* (internal quotation marks omitted); *see also Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period [ ] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action") (citation omitted).

Here, Plaintiff alleges that Defendant discharged her on August 12, 2009, in retaliation for the EEOC charge she filed on June 4, 2009.  Doc. 29 at 33-35. Defendant concedes that Plaintiff engaged in statutorily protected activity and suffered an adverse employment action.  Doc. 23 at 17.  However, Defendant contends that Plaintiff's prima facie case fails because she "cannot show [ ] that the termination was causally related to the protected activity."  *Id.*  The court disagrees because it is undisputed that Wadley "thinks" he received notice of Plaintiff's EEOC charge prior to Plaintiff's discharge.  Doc. 24-3 at 43; Wadley depo. at 166.  This fact, coupled with the discharge occurring just two months after Plaintiff filed her EEOC charge, is sufficient to create a "reasonable inference of a causal relation between the protected expression and the adverse action."  *See Higdon*, 393 F.3d at 1221.  Therefore, since the burden is exceedingly light, this court holds that Plaintiff has established a prima facie case of retaliation.

To prevail, however, Plaintiff must overcome Defendant's legitimate, non-retaliatory reason for her discharge. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001) (citation omitted).  In that regard, Defendant contends that it discharged Plaintiff because while at the suspension level of the progressive discipline steps, Plaintiff called in absent for five consecutive days, which qualified for the next discipline level – discharge.  Doc. 23 at 17-18.  Indeed, it is undisputed that Plaintiff missed the entire week of August 3, 2009, even though Defendant scheduled her to work that week.  Doc. 24-1 at 33; Word depo. at 122-27.  Further, although Plaintiff quarrels with the meaning of the conversion of her December 2008 discharge to a suspension, it is undisputed that she knew her suspension status and yet missed an entire week thereafter. *Id.*; doc. 24-2 at 43.  Therefore, Defendant has satisfied its "exceedingly light" burden. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (citation omitted).

To prevail, Plaintiff must show that Defendant's articulated reason is pretext for unlawful retaliation. *Pennington*, 261 F.3d 1266.  Plaintiff seeks to make this showing in three ways.  She contends that:  (1) Wadley and Tulley treated her thirty-day suspension as "administrative" and "claimed they did not have to review it with her," but later counted it against her to progress to the next level of discipline, doc. 29 at 43; (2) Defendant advanced her to the next level of discipline

after "one occurrence," while Defendant allowed purportedly similarly situated employees, Joshua Heintz ("Heintz"), Valerie Hill ("Hill"), and Damion Fikes ("Fikes"), at least two occurrences before discharging them, doc. 29 at 33-34; and (3) Defendant articulated inconsistent reasons for denying her vacation leave, doc. 29 at 43-44.  The court addresses each contention below.

1.    *Plaintiff's reinstatement at the suspension level does not establish pretext.*

First, as to Plaintiff's contention that Wadley and Tully treated the 30-day suspension as "administrative," did not review it with her, and then used it to "justify moving to the next step of discipline (termination)," doc. 29 at 43, Plaintiff is claiming basically that although Defendant converted her discharge six months later to a 30-day suspension, the suspension, nonetheless, did not count as a "real" suspension and that Defendant intended to start the disciplinary process over with her and only changed its mind when it received her EEOC charge. Stated differently, Plaintiff is asking this court to believe that, although she had advanced to the discharge and final level in the progressive discipline steps, that when Defendant agreed to reduce her discharge one level back to a suspension, that Defendant actually meant to take her back to step one, i.e., informal counseling.  Even if the court ignores the fact that this assertion defies logic, the

court cannot overlook that Plaintiff failed to present any factual support for her

assertion.  Plaintiff simply cannot defeat summary judgment with unsubstantiated

assertions.  *Ellis*, 432 F.3d at 1326.

Moreover, Plaintiff's own testimony on this point undermines her

contention:

> Q.    What was it that Mr. Smith told you over the phone about the
>       agreement?
>
> A.    They removed the letter in lieu of dated June 23rd, 2008.  I
>       would return back to work on June 29th, 2009.  I would be
>       awarded all of my vacation, HO days and DP days.  They
>       would not entertain giving me back pay for the time that I had
>       been off.  They would change the codes for the court dates
>       from codes that count against me to codes that did not count
>       against me.  They would remove the termination.  I would keep
>       my seniority.  I would keep my same rate of pay.  And I would
>       get a 30-day suspension.
>
> Q.    Okay.
>
> A.    So I say, what is a 30-day suspension?  Mr. Smith explained to
>       me that because I had been off payroll for more than six
>       months, the only way I can come back with my time merged,
>       keep my seniority, benefits and pay everything, my vacation
>       and all that, is for them to show that I was on a 30-day
>       suspension.

Doc. 24-1 at 27;  Word depo. at 97-98.  Later in the deposition, Plaintiff stated:

> That's when [Smith] told me what they were going to give me, about
> the 30-day suspension.  And I asked him what was the 30-day
> suspension.  And he - - he explained to me because I had been off

payroll for more that six months that if I come back without the 30-day suspension, I would come back as a new employee under the new terms and conditions which AT&T had in place for new employees at that time. Meaning I wouldn't have seniority. I wouldn't be paid the same. You know, my benefits would be three to six months before they kick in and things like that. So Mr. Smith explained to me that this 30-day suspension was a must have if I wanted seniority, pay and all those things back.

* * * *

So I asked him what is a 30-day suspension. And he explained to me that the 30-day suspension would be put in my file because I - - because if I - - if I wanted to be as if I never left payroll, that that had to be put in my file in order for - - he didn't say it was a disciplinary action that needed to be put in your file for you to keep you time and money and all this stuff. He said that it was something they had to do because I had been off payroll for six months and that's the only way that their system will recognize me as an ongoing employee.

Doc. 24-1 at 27, Word depo. at 100; *id.* at 31, Word depo. at 113. Contrary to

Plaintiff's contention, nothing in her summary of her conversations supports the

assertion that the Union informed her that her suspension had no disciplinary

relevance, that she received a clean slate, and reverted back to the first step of the

progressive disciplinary step. In fact, Plaintiff's assertion rings hollow because

Smith followed up his verbal communications with a letter, which also made no

representation about a clean slate: "[Defendant] agrees without prejudice or

precedent to either party to change termination to a 30 day suspension entry,

remove the suspension in lieu letter dated 06/23/08, see page 2, section #16

changing coding from 'h' to 'excused unpaid' for time out on 11/19/08 and

12/08/08."[6]   Doc. 24-2 at 43; doc. 24-1 at 29, Word depo. at 107.

Significantly, even if Plaintiff's conversations with the Union gave her the impression that Defendant would reinstate her with a clean disciplinary slate, the incorrect information does not help Plaintiff establish pretext because the alleged erroneous information came from the Union.  Indeed, because the Union represented Plaintiff during her grievance, the CBA dictated that Defendant "not discuss or adjust such grievance with [Plaintiff] unless [Plaintiff] initiated a request that [Defendant] discuss and adjust such grievance [ ], but in no event will an adjustment be made unless a Union representative is afforded an opportunity to be present."  Doc. 24-11 at 15.  There is no evidence here that Plaintiff requested that Defendant discuss the terms of her reinstatement.  In fact, as discussed, *infra*, Plaintiff is actually claiming that Defendant never met with her to discuss her reinstatement terms.  Doc. 29 at 43.  As such, Plaintiff cannot use any impression created by her Union to infer or impute pretext on Defendant.  Stated differently, Plaintiff has no credible basis to assert that Defendant retaliated against her by changing its position when that alleged initial position is not based on any direct

---

[6]The "H [home conditions]" code is used for absences "due to personal reasons (other than the employee's own illness) or home condition," doc. 24-8 at 23, and is a summarized absence, i.e., it is an unexcused absence and "counts against an employee's attendance record." Doc. 23 at 7, ¶¶ 12, 13.

communication Plaintiff had with Defendant.  In short, Plaintiff simply cannot escape the fact that she knew about the suspension and that nothing in the record even hints at the non-binding suspension Plaintiff alleges Defendant agreed to purportedly undertake.

Likewise, the exchange Plaintiff cites from Wadley's deposition to support her contention also falls short of establishing that Defendant considered her suspension "administrative."  In fact, the exchange centered on Plaintiff's contention that Defendant failed to provide her a pre-suspension meeting, which Wadley rebutted by pointing out that Defendant held the meeting when it discharged Plaintiff and that it made no sense to hold another meeting when Defendant agreed later to change the discharge to a suspension:

> Q.    Do your rules require that the supervisor should go over [Plaintiff's 30 day suspension entry] with the employer?
>
> A.    The rules are - - excuse me, those are guidelines.  They're not necessarily rules.
>
> Q.    Well, they're the attendance and punctuality guidelines, aren't they?
>
> A.    They are guidelines, and we were so advise[d] by our labor people who made the agreement that this did not have to be covered with her directly.  We were given specific instructions for administrative purposes to place this in her record, and that's what we did.

Q.      Isn't it true down here in suspension on page 40 of the guidelines that it says that the supervisor is supposed to go over these with the employee?

A.      Yes, sir, but that's not in reference to an agreement with the CWA.  That's in reference to a normal processing of disciplining.  This was an administrative entry to replace a termination, which we were advised to do so.  That does not cover our circumstance.  That was a different circumstance.

Q.      Well, let's make sure the record's clear.  What I'm showing you is 9.09 suspension in letter in lieu of.

A.      Correct.

Q.      And you're saying that this is different from what we have in [Plaintiff's 30 day suspension entry].

A.      I'm saying the circumstance is different.  That is talking about the administration of discipline.  This is in reference to administrative of an agreement made with CWA.  Those are two entirely different issues.

Q.      Are you saying, then, that this is - - what's shown in [Plaintiff's 30 day suspension entry] is not discipline?

A.      This is a step of discipline.  This is also fulfilling an agreement that was made with CWA.  And as such, the company is not required to go through a normal disciplinary meeting that you ordinarily would have.  Because the disciplinary meeting was already held when there was a termination.  And at the termination, the employee was provided with a copy and [that was] the normal termination process.  Since we are now - - have an agreement with CWA and are implementing that agreement, we are not going to go back and hold another disciplinary meeting and present the employee with another entry. That was already done at termination.  And we are now

fulfilling the agreement that was made. <u>And the agreement was</u> <u>to remove - - to change the termination to a suspension, which</u> <u>we have done.</u>

Doc. 24-3 at 35-36; Wadley depo. at 135-38 (emphasis added). Contrary to Plaintiff's contention, Wadley's testimony demonstrates unequivocally that Defendant considered the suspension a disciplinary action. After all, Defendant agreed simply to reduce Plaintiff's discharge one step back to a suspension and give her another opportunity to salvage her employment. To the extent that Plaintiff misunderstood, or perhaps forgot what it meant to be at the suspension step in the progressive discipline ladder, she has failed to show that Defendant intentionally misled her, or that retaliatory animus caused Defendant to purportedly mislead her. Therefore, Plaintiff's contention that Defendant considered the suspension "administrative" falls short of establishing pretext.

   2.   *Defendant's varying reasons for denying Plaintiff leave August 3-7, 2009, do not establish pretext.*[7]

Plaintiff attempts next to establish pretext by challenging Defendant's credibility based on the response Plaintiff received when she requested leave from August 3-7, 2009. Specifically, Plaintiff contends that, initially, "Cheryl Holmes,

---

[7]Plaintiff's contention that Defendant's proffered reason for her discharge was pretext because Defendant allowed Heintz, Valerie Hill, and Damion Fikes at least two occurrences before discharge, doc. 29 at 42, is discussed, *infra*, in sections B.1.a and B.2.a. and b.

Ms. Willie, and Ms. Ford" told her that she could not take leave from August 3-7, 2009, because she was not in the system, doc. 24-1 at 34, Word depo. at 126, but that Wadley testified in his deposition that no leave was available that week, doc. 29 at 44; doc. 24-3 at 32, Wadley depo. at 124.  This contention misses the mark for several reasons.  First, Plaintiff is not challenging the denial of vacation in this lawsuit.  Therefore, the reasons provided to her on this issue are irrelevant and have no bearing on whether Defendant's reasons for her discharge are pretextual.  Second, because pretext requires some showing that the defendant's proffered reason is false, Plaintiff cannot establish pretext on the vacation time issue where, as here, Defendant's employees conveyed the same message in 2009 and again during discovery, i.e., that Plaintiff could not take leave.  Doc. 24-1 at 34, Word depo. at 126.  In the final analysis, whether Defendant denied Plaintiff leave either because Plaintiff was not in the system or because leave was not available is a contention that does not help Plaintiff unless she can show that Defendant had leave available or intentionally delayed adding Plaintiff into the system.  Plaintiff failed to make such a showing and, in fact, does not contest Defendant's assertion that it had no leave available.  Apparently, because she cannot contest Defendant's assertions about the unavailability of leave, Plaintiff seeks instead to manufacture an issue of fact when none exists on the critical issue before this court, i.e.,

whether Defendant's contention that it discharged her because she missed work on August 3-7, 2009, is pretextual.  In short, Plaintiff has not met her burden of meeting Defendant's reason for her discharge "head on."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted).  Therefore, summary judgment is granted on Plaintiff's Title VII and Section 1981 retaliation claim.[8]

## B.   Title VII and Section 1981 Race and Color Discrimination

Again, the analysis for race and color discrimination claims under Title VII and Section 1981 is the same, *see Standard*, 161 F.3d at 1330, and the *McDonnell Douglas* framework applies here also since Plaintiff is using circumstantial evidence.  *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted).  A plaintiff establishes a prima facie case by showing: (1) membership in a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) treatment of a similarly situated employee outside of her protected class more favorably.  *Knight v. Baptist Hosp. of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003) (citations

---

[8]Plaintiff's bald contention of pretext based on her purported satisfactory attendance prior to her August 12, 2009, discharge defies logic and common sense.  Although this court does not sit as a super personnel department, *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (citations omitted), her reinstatement at a suspension level on June 29, 2009, and then just five weeks later, calling in on five consecutive days are hardly quintessential examples of satisfactory attendance.  That Plaintiff chose to miss work despite knowing that leave was not available to her, and did so after Defendant agreed to reinstate her is quite telling and probably explains why the Union chose not to pursue her grievance.

omitted).  A similarly situated employee is one whose "misconduct . . . was nearly identical to that engaged in" by the plaintiff.  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002) (quotation marks and citation omitted).  The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation omitted).

After the plaintiff establishes a prima facie case, "then the defendant must show a legitimate, non-discriminatory reason for its employment action."  *Burke-Fowler*, 447 F.3d 1323 (citation omitted).  "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination."  *Id*.  "To show pretext, a plaintiff may demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered reasons for the employment action such that 'a reasonable factfinder could find them unworthy of credence.'"  *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (quotation marks omitted).  "However, the plaintiff cannot merely quarrel with the wisdom of the employer's reason, but 'must meet the reason head on and rebut it.'"  *Licausi v. Symantec, Corp.,* 378 Fed App'x 964, 966 (11th Cir. 2010) (citation omitted).

To support her discrimination claim, Plaintiff identifies two purported similarly situated employees she contends Defendant treated more favorably. The court addresses each of these alleged comparators below.

1. *Plaintiff fails to establish a prima facie case of race discrimination.*

    a.  Joshua Heintz

Plaintiff maintains that Defendant treated Heintz, a white male, more favorably by (1) rapidly reinstating him at step one of the grievance process, doc. 29 at 28, (2) allowing Heintz to use vacation days after his reinstatement, *id*. at 27-28, and (3) discharging him after two occurrences, instead of one as Defendant purportedly did with Plaintiff, *id*, at 27.  A review of Heintz's record shows that he received the following progressive discipline steps due to unsatisfactory attendance:  (1) counseling entry on September 5, 2008; (2) warning on January 7, 2009, that Defendant removed after a Union grievance settlement; (3) warning on March 17, 2009; (4) suspension on March 24, 2009; and (5) discharge on April 20, 2009, which Heintz challenged.  Doc. 24-7 at 17, ¶58.  As part of the grievance process, the Union and Defendant agreed that, under the CBA, Heintz's September 5, 2008, counseling entry actually expired before he received his March 17, 2009,

warning, since he had a period of six months with no intervening discipline.[9]  *Id*.

at 18, ¶59.  In light of this fact, Defendant reduced each of Heintz's progressive

discipline levels by one level, such that the March 17, 2009, warning became a

counseling entry, the March 24, 2009, suspension became a warning, and the April

20, 2009, discharge became a suspension.  *Id*.  As a result, on May 19, 2009, one

month after his discharge, Defendant reinstated Heintz at a suspension level.  *Id*. at

¶60.

Plaintiff contends first that she is similarly situated to Heintz because she

received her June 23, 2008, SL because Defendant erroneously counted two

FMLA approved days (December 1, 2007, and December 3, 2007) against her, and

that Defendant discharged her on December 9, 2008, because again it erroneously

---

[9]The relevant portion of the CBA reads:

18.01 Personnel Records
B.  A counseling entry that has been on file for a period of six (6) months without
any intervening disciplinary action pertaining to the same subject matter will be
removed from the employee's personnel record.  A warning entry will be removed
after 24 months and all remaining entries will be removed after a period of 36
months subject to the preceding criteria.  Any related data will also be removed
with the entry from the personnel record and should not be taken into
consideration in the future.

Doc. 27 at 26.  Here, since Defendant removed Heintz's January 7, 2009, warning because of a
grievance settlement, it meant that between September 5, 2008, and March 17, 2009, Heintz had
"a period of six (6) months without any intervening disciplinary actions. . . ."  *Id*.  As such, the
September 5, 2008, counseling fell off before the March 17, 2009, entry since six months had
expired.

counted FMLA approved days (November 12-14, 2008).  Doc. 29 at 28-29.

Plaintiff contends further that Defendant treated her less favorably than Heintz

because Defendant refused to reinstate her until her grievance reached the State

level, i.e., step three.  Doc. 29 at 29.

Plaintiff's contentions fail for several reasons.  First, Plaintiff is incorrect

that Defendant penalized her for the FMLA approved December 1, 2007, and

December 3, 2007, leave, and, in fact, she admitted in her affidavit that Defendant

did not count those two days towards the determination on whether to issue her

June 23, 2008, SL:

> On July 8, 2008, I was advised by Cheryl Holmes that [December 1,
> 2007, and December 3, 2007] were [FMLA] approved.  On that same
> date, I communicated this approval to [Coleman] and informed her
> that I now only had five occurrences,[10] instead of 7, and requested her
> to reverse the [SL] actions dated June 23, 2008. [Coleman] advised
> me that she still had 'enough' occurrences to move on me and that the
> [SL] will stay in my file.  [Coleman] went on to say that when we
> have the grievance meeting with [Reese], she would agree to remove
> the June 23, 2008 in six months."

Doc. 26 at 4-5, ¶22.  Indeed, Coleman testified that Defendant approved the

December 1, 2007, and December 3, 2007, absences for FMLA leave prior to

---

[10]Plaintiff's affidavit states that she had the following five attendance occurrences:
November 2, 2007 (30 minutes), November 13, 2007 (2 hours, 19 minutes, family court), March
29, 2008 (one day or 7.5 hours), April 26, 2008 (2 hours), and May 5, 2008 (1 day or 7.5 hours).
Doc. 26 at 4.

issuing the June 23, 2008, SL and, as such, she did not count them towards the SL discipline.  Doc. 24-5 at 10; Coleman depo. at 33-34.  In fact, Coleman testified that she counted six occurrences instead,[11] which were sufficient to advance Plaintiff to the SL.  Doc. 26 at 4 ¶22; doc. 24-5 at 10 and 11, Coleman depo. at 33-34, 37.  In any event, on July 22, 2008, after a grievance meeting with Plaintiff and Reese, although the CBA only obligated Defendant to remove SL entries after thirty-six months, doc. 27 at 26, Coleman agreed to remove the SL within six months "if satisfactory attendance is achieved and maintained," doc. 27 at 16.  Despite Coleman's willingness to bend the rules for Plaintiff and to give Plaintiff a chance to save her job, Plaintiff committed subsequent infractions which caused Defendant to discharge her on December 9, 2008, for unsatisfactory attendance.

As to Plaintiff's contention in her brief that "[Defendant] miscounted FMLA days for November 12, 2008 through November 14, 2008, as occurrences in reaching its decision to terminate [Plaintiff] in December 2008," doc. 29 at 29, interestingly, Plaintiff admits in her affidavit that Defendant did not count the November 12-14, 2008, absences:

---

[11]Coleman testified that Plaintiff had the following six attendance occurrences: November 2, 2007 (30 minutes), November 13, 2007 (court summons), March 29, 2008 (all day), April 26, 2008 (2 hours), May 5, 2008 (pending, all day), and June 19, 2008.  Doc. 24-5 at 11, Coleman depo. at 38; doc. 24-6 at 19, Coleman depo. Ex. 6.

> November 12, 2008 thru November 14, 2008 were one occurrence
> and were pending FMLA days which were later approved on
> December 10, 2008. [ ] At the grievance hearing, [Reese] stated that I
> should be reinstated because the company erroneously included
> pending FMLA days. [Wadley] said he needed to check and left the
> meeting.  When [Wadley] returned, he said those days were not
> included in the termination occurrences.

Doc. 26 at 8, ¶¶ 37-38.  As is evident, Plaintiff's own testimony contradicts her

counsel's argument that Defendant counted FMLA approved days towards her

December 9, 2008, discharge.  Plaintiff's affidavit controls on this issue because

"[s]tatements by counsel in briefs are not evidence." *Bryant v. U.S. Steel Corp.*,

428 Fed. App'x 895, 897 (11th Cir. 2011), citing *Skyline Corp. v. N.L.R.B.*, 613

F.2d 1328, 1337 (5th Cir. 1980).  In any event, Defendant had no need to count

these days because, while at the suspension discipline level, Plaintiff still had

attendance occurrences on June 27, 2008 (4 hour unexcused absence), August 4,

2008 (full day unexcused absence), November 19, 2008 (full day unexcused

absence), and December 8, 2008 (1 hour and 45 minutes unexcused absence).

These occurrences triggered Defendant's decision to discharge Plaintiff.  Doc. 26

at 8; doc. 24-7 at 12 ¶ 36.

　　　In contrast, Defendant reached the termination stage for Heintz because it

included erroneously a counseling entry that had rolled off under the CBA.  *See*

*supra*, n. 9.  When the Union pointed this fact out during the grievance process,

Defendant realized that it should have had Heintz only at the suspension level and, as a result, reinstated Heintz. Because Defendant did not include any erroneous entries in Plaintiff's count, Plaintiff is not similarly situated to Heintz and the court has no basis to compare Defendant's rehire determinations. Accordingly, as it relates to Plaintiff's first discharge, Plaintiff has failed to establish that Defendant treated her less favorably than Heintz.

Regarding her second discharge, Plaintiff contends that Defendant treated Heintz more favorable because it "allowed [Heintz] two occurrences before his 2nd termination," but yet discharged Plaintiff after only one occurrence,[12] and allowed Heintz to "use his vacation days after his return to work." Doc. 29 at 27-28. Again, Plaintiff fails to establish that she and Heintz are similarly situated. Defendant reinstated Heintz at a suspension level on May 19, 2009, *id*. at ¶60, and after Heintz reported to work less than fifteen minutes tardy on October 23, 2009, and October 27, 2009, doc. 24-4 at 58, doc. 24-7 at 18, Wadley declar. ¶60,

---

[12]Although Plaintiff contends that Defendant discriminated against her as it relates to her second discharge, she failed to amend her June 4, 2009, EEOC Charge to include the August 12, 2009, discharge. Doc. 24-2 at 39; doc. 23 at 9, ¶ 31. As such, Plaintiff failed to exhaust her administrative remedies regarding the second discharge and the EEOC has not had the first opportunity to investigate it and "perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citations omitted). However, because this discharge is "like" the allegations contained in the charge, and courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," *Sanchez v. Std. Brands., Inc.*, 431 F.2d 455, 461, 466 (11th Cir. 1970), the court will consider the claim.

Defendant discharged him a second and final time.  Basically, Plaintiff contends that Defendant's failure to discharge Heintz after his first tardy is evidence of discrimination since Defendant discharged Plaintiff after "one occurrence" – albeit an occurrence that involved five straight missed days.  Apparently, in Plaintiff's view, all consecutive day infractions, no matter the total length, are less severe than other infractions that are separated by a day or two of compliance.  Stated differently, Defendant is right to count Heintz as having two separate infractions because Heintz came to work on time the day after the first one, and, yet, Defendant should treat Plaintiff as having only one infraction for the full week she missed because Plaintiff never bothered to report to work at all during that week. This contention defies logic and would incentivize employees to place a bigger burden on their employers by encouraging them to miss multiple days in a row.

Fortunately, this court is guided by well settled case law that courts "do not sit as a 'super-personnel department,' and that it is not our role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive."  *Alvarez*, 610 F.3d at 1266.  Here, Defendant implemented a policy that the rate of absenteeism is measured by days absent divided by days scheduled. Doc. 24-8 at 46.  Under this policy, Heintz's two tardies totaled fifteen minutes

and Plaintiff's five consecutive full-day absences totaled 40 hours.  In other words, the quantity and quality of Heintz's attendance occurrences differed sharply from Plaintiff's, resulting in Plaintiff having an absenteeism rate that was significantly greater than Heintz.  Because the case law is clear that the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," *Maniccia*, 171 F.3d at 1368 (citation omitted), Plaintiff is not similarly situated to Heintz in even the broadest interpretation of the term. Accordingly, the court cannot compare Defendant's discharge decisions and, therefore, Plaintiff has failed to establish that Defendant treated her less favorably than Heintz.

Finally, Plaintiff's contention that Defendant treated Heintz more favorably because Defendant allowed Heintz to use vacation days after his reinstatement also misses the mark.  First, as stated earlier, is it undisputed that Defendant had no leave available on August 3-7, 2008, for Plaintiff to take.  Doc. 23 at 11. Second, after his reinstatement, Heintz worked five months before Defendant discharged him, which allowed him sufficient time to request leave and have it approved.  In contrast, after her reinstatement, Plaintiff worked only <u>five weeks</u> before her five day consecutive unexcused absence that caused Defendant to

discharge her.  Based on these facts, the court has no basis to determine that Defendant treated Plaintiff less favorably than Heintz regarding leave requests.

      b.    Jordan Means

      Plaintiff's next comparator is Jordan Means ("Means"), a white male employed as a sales associate.  Doc. 24-10 at 10, ¶¶29, 30.  The scant evidence reveals that Means "left work early," causing Defendant to discharge him on July 19, 2007.  Doc. 24-10, ¶33.  Defendant learned afterwards that Means left because his fiancé or girlfriend was involved in a catastrophic vehicle accident.  *Id*. at ¶34.  Consequently, Defendant reversed its decision to discharge Means "based on that final occurrence" and rehired him.  *Id*. at ¶35.  Over a year later, on October 24, 2008, Defendant discharged Means again, this time for unsatisfactory attendance, and Means submitted a resignation letter that same day.  *Id*. at ¶36.  This information is insufficient to show that Means is similarly situated to Plaintiff.  In fact, as to Plaintiff's second discharge, even Plaintiff concedes that she lacks evidence to show that she is similarly situated to Means, albeit because she contends Defendant "failed to reveal the number of occurrences Means had after restoration of employment, before he was fired again."  Doc. 29 at 28.  If anything, the information shows the Defendant treated Means more harshly since it discharged him after just one attendance infraction.

Because the quantity of attendance occurrences for Heintz and Means differ from Plaintiff's, *see Maniccia*, 171 F.3d at 1368, neither is similarly situated to Plaintiff.  Consequently, Plaintiff has failed to establish a prima facie case of race discrimination.  Alternatively, even if Plaintiff can somehow make a prima facie case, she cannot overcome Defendant's articulated reasons for her discharge – i.e., she missed five straight days without an excuse.  *See infra* at B.3.  Therefore, summary judgment is granted on the race discrimination claim.

2.    *Plaintiff cannot establish a prima facie case of color discrimination.*

Plaintiff's color discrimination claim is based on her contention that Defendant treated Damion Fikes and Valerie Hill, both lighter skinned African-Americans, more favorably by rehiring them and allowing them to incur several attendance occurrences before discharging them.  Doc. 29 at 31.  For color discrimination claims based on circumstantial evidence, a plaintiff must establish a prima facie case by showing that:  (1) she is in a protected class; (2) the employer subjected her to an adverse employment action; (3) she was qualified for the job; and (4) her discharge arose under circumstances giving rise to an inference of color discrimination, i.e., that the employer treated others outside of her protected class more favorably.  *See Wali v. One Source, Co.*, 678 F.Supp.2d 170, 179-180 (S.D.N.Y. 2009); *see also Walker v. Sec. of Treasury, I.R.S.*, 713 F.Supp. 403,

405-408 (N.D. Ga. 1983).  Plaintiff failed to meet her burden.

        a.    Valerie Hill

Again, the law is clear that the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions." *Maniccia*, 171 F.3d at 1368 (citation omitted). Hill is not a proper comparator because her disciplinary infractions involved tardies.  Specifically, after Hill reached the suspension stage in the disciplinary ladder, she subsequently had eight tardies, which led to her discharge for unsatisfactory attendance on September 19, 2008.  Doc. 24-7 at 18, ¶61.  After Defendant rehired Hill at a suspension level on October 31, 2008, she received seven additional tardies and "2 part session absences," totaling less than three hours, leading to her second discharge on May 22, 2009.  *Id.*

Hill is not a proper comparator because although she had a problem getting to work on time, Hill never failed to report to work at all.  In contrast, again, Defendant discharged Plaintiff after she missed five straight days or forty hours of work while at a suspension level.  Under Defendant's policy of measuring absenteeism,[13] Plaintiff's absenteeism rate is significantly higher than Hills', i.e.

---

[13] 9.03F.  Measure of Absenteeism
The most useful measurement is the absentee rated expressed as a percentage (days absent divided by days scheduled).  By days scheduled, we include all days the employee

forty hours of absences versus less than three hours for Hill.  Based on this record, Hill is simply not similarly situated to Plaintiff.  *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1318 (11th Cir. 2003) ("In the light of the entire record, [plaintiff] and [comparator] are not similarly situated. [Plaintiff's] documented performance and tardiness problems were much worse than [comparator's] in both number and nature."); *see also Catanzaro v. Lyons*, 232 Fed. App'x 878, 880 (11th Cir. 2007) (failure to report for work at all is different from reporting to work tardy).  To hold, as Plaintiff asks, that tardies should count the same as absences would result in this court "second-guessing employers' reasonable decisions and confusing apples with oranges."  *Maniccia*, 171 F.3d at 1368.  The court declines to do so and will leave the business decisions to Defendant.

            b.    Damion Fikes

    Likewise, Plaintiff is not similarly situated to Fikes whose disciplinary actions were also primarily due to tardies.  Fikes received the following discipline: counseling on July 3, 2008, after accumulating ten 5-10 minute tardies; warning on October 14, 2008, after receiving four tardies that were "a few minutes long;" suspension on December 15, 2008, after receiving three tardies and a 3/4 hour

---

was scheduled or would have been schedule had it not been for an absence.

unexcused absence; and discharge on March 31, 2009, after receiving two tardies and one thirty-minute unexcused absence.  Doc. 24-7 at 19, ¶62.  Defendant reinstated Fikes on April 27, 2009, after he filed a grievance challenging his discharge.  *Id*.  Thereafter, after Fikes received two more tardies and two fifteen-minute unexcused absences, Defendant discharged Fikes again for unsatisfactory attendance on December 16, 2009.  *Id.*  For the same reasons as Hill, i.e., that Plaintiff's absenteeism rate was significantly higher, Plaintiff is also not similarly situated to Fikes.  Therefore, Plaintiff failed to establish a prima facie case of color discrimination.

    *3.    Pretextual*

    Alternatively, even if Plaintiff could somehow establish a prima facie case of race and color discrimination, her claims still fall short because she failed to establish pretext.  First, as evidence of pretext, Plaintiff contends that Defendant counted as unexcused absences FMLA approved days on December 1, 2007, and December 3, 2007, and that these two days led to an SL she received on June 23, 2008.  Doc. 29 at 42.  However, Plaintiff overlooks conveniently that even if Defendant incorrectly counted the two FMLA days, she still had at least five attendance occurrences related to the June 23, 2008, SL:  "I [ ] informed [Coleman] that I now had only 5 occurrences, instead of 7, and requested her to

reverse the [SL] actions dated June 23, 2008.  [Coleman] advised me that she still

had 'enough' occurrences to move on me and that the [SL] will stay in my file. "

Doc. 26 at 4, ¶22.[14]  In short, Plaintiff's acknowledgment of her unsatisfactory

attendance buttresses Defendant's proffered reason that it issued Plaintiff the SL

due to unsatisfactory attendance.  *See Cooper*, 390 F.3d at 725.  Moreover,

Plaintiff overlooks also that, as part of the June 26, 2009, grievance settlement,

which occurred after Plaintiff filed her EEOC charge on June 4, 2009, Defendant

agreed to remove the June 23, 2008, SL.  Doc. 24-2 at 43.  This meant that

Defendant agreed not to count the June 23, 2008, SL against any subsequent

infractions.  Indeed, Defendant discharged Plaintiff on August 12, 2009, due to

Plaintiff's "unsatisfactory attendance since she had been at a suspension level of

------

[14]Coleman testified that the December 1, 2007, and December 3, 2007, dates did not count toward Plaintiff's June 23, 2008, SL and that Plaintiff had six occurrences that led to the SL in question:

> Q.     Had you gotten resolution of the FMLA days before you gave the
>        discipline, the SL, in June '08?
> A.     For the December dates?  Yes.
> Q.     The December '07?
> A.     Yes.
> Q.     Well, are you saying then that by the time you gave the SL, you did not
>        count the December of '07 occurrences?
> A.     That is correct.
>                                                    * * * *
> Q.     So when you gave her the SL, according to Plaintiff's 6, she only had six
>        occurrences?
> A.     Yes.

discipline [based on the decision to reinstate her after her December 12, 2008,

discharge] and then had five full work days of absence for personal reasons."

Doc. 23 at 13.  In other words, Plaintiff simply cannot claim pretext based on a

disciplinary action that Defendant expunged from her record.

    Second, Plaintiff attempts to show pretext next by contending that

Defendant erroneously counted an FMLA approved attendance occurrence on

November 12, 13, and 14, 2008, and court appearances on August 4, 2008,

November 19, 2008, and December 8, 2008, towards her December 2008,

discharge.  Doc. 29 at 42-43.  As stated earlier, Plaintiff admits that Defendant did

not count the November 12, 13, and 14, 2008, absences towards her December 9,

2008, termination.  Doc. 26 at 8, ¶¶ 37-38.  Further, on June 22, 2009, at the step

three of the grievance process regarding Plaintiff's December 9, 2008, discharge,

Defendant excused Plaintiff's November 19, 2008, and December 8, 2008,

absences.  Even with those excused absences, Plaintiff still had unexcused

attendance occurrences on June 27, 2008 (four hours), and August 4, 2008 (full

day), which are sufficient to trigger the next step in the disciplinary process.  As

Wadley testified, there is "no hard and fast rule.  We treat individuals on an

individual basis," and "[t]here's implementation of discipline at three days.  There

is implementation at one day."  Doc. 24-3 at 15, Wadley depo. at 56, 55.  This fact

is evidenced by Heintz's discharge while at the suspension level after only two tardies totaling less than 15 minutes each, doc. 24-7 at 18, Wadley declar. ¶60, which is far less egregious than Plaintiff's full and half day absences on June 27 and August 4, 2008. In other words, even when this court removes the FMLA approved absences, Plaintiff has not offered any evidence to call into question Defendant's contention that it discharged her due to unsatisfactory attendance.

Finally, as it relates to Plaintiff's August 12, 2009, discharge, as stated earlier, Plaintiff attempts to show pretext by contending that Defendant (1) treated her thirty-day suspension as "administrative" but later counted it against her for disciplinary purposes, (2) advanced her to the next level of discipline after only one occurrence, but allowed other employees at least two occurrences before discharging them, and (3) articulated inconsistent reasons for her discharge. Doc. 29 at 43. For the same reasons as stated therein, *see supra*, B.1. and 2., a. and b., Plaintiff failed to establish that Defendant's reasons for her discharge are pretextual. In short, Plaintiff's contentions fail to "meet . . . head on" Defendant's claim that it discharged her due to unsatisfactory attendance. *Chapman*, 229 F.3d at 1030. Therefore, summary judgment is granted on Plaintiff's race and color discrimination claims.

C.   **FMLA Interference and Retaliation**

The FMLA grants eligible employees the right to "12 work weeks of leave

during any 12-month period . . . [b]ecause of a serious health condition that makes

the employee unable to perform the functions" of her position, 29 U.S.C.

§2612(a)(1), and the right to "be restored by the employer" to her previous or

equivalent position.  To enforce these rights, the FMLA created claims for

interference and retaliation, both of which Plaintiff asserts in this case.

1.   *Interference*

An FMLA interference claim requires the plaintiff to show that the

employer denied her a benefit to which she was entitled.  *Strickland v. Water*

*Works and Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).  In that regard,

Plaintiff contends that Defendant denied her FMLA approved leave (1) in

December 2007, when, although she received eight weeks of FMLA approved

time, Defendant required her to return to work after five and one-half weeks,

"thereby shortening her FMLA leave," and (2) in September 2008, she received a

"return to work slip for November 2008, but Defendant required her to return to

work in October, 2008, prior to the expiration of her FMLA leave."  Doc. 29 at 36-

37.

Plaintiff cites to her affidavit to support her contentions.  However, for the

December 2007 claim, the affidavit cites to exhibits three and four, which Plaintiff failed to provide to the court. *See* doc. 29 at 36; doc. 26 at 3 ¶14 and 15; doc. 27 at 6-7, 9-10. Therefore, the court has nothing to review to ascertain whether Plaintiff can establish her claim. Likewise, regarding the September 2008 leave, Plaintiff does not direct the court to any evidence, or include any supporting documentation. *See* doc. 29 at 37; doc. 26 at 7 ¶32. The failure to provide evidentiary support is fatal because "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis*, 432 F.3d at 1326. Therefore, the FMLA interference claim fails.

  2.   *Retaliation*

  Plaintiff also contends that Defendant retaliated against her when it (1) erroneously counted FMLA approved days towards her June 23, 2008, SL, (2) issued her a SL letter on January 11, 2008, when she returned to work after eight weeks of FMLA approved leave, (3) erroneously counted FMLA approved days on November 12-14, 2008, and discharged her subsequently on December 9, 2008. Doc. 29 at 37-38. As discussed *supra* at B.1.a., Plaintiff admitted that Defendant did not count FMLA approved days towards her June 23, 2008, SL and her December 9, 2008, termination. Therefore, summary judgment is due on these two contentions.

Regarding Plaintiff's contention that Defendant issued her a SL when she returned to work after FMLA approved leave, doc. 29 at 38, Plaintiff cites as evidence only her affidavit exhibit five, which contain the SL dated January 11, 2008, and the corresponding personnel record entry sheet, doc. 26 at 3-4, Word aff. at ¶¶ 15 and 16; doc. 27 at 8-9, Word aff. Exs. 5, and Exhibit 6, which Plaintiff failed to provide to the court, *see* doc. 27 at 9-10.  As stated earlier, Coleman testified that the SL in question was "inadvertently dated January 11, 2008, instead of June 23, 2008."  Doc. 24-7 at 10.  In other words, Coleman asserts that the SL dated January 11, 2008, was, in fact, Plaintiff's June 23, 2008, SL.  Plaintiff failed to rebut this contention.  Moreover, the record supports Coleman because, if Plaintiff is correct, then after Plaintiff's subsequent attendance infractions on March 29, 2008, and May 5, 2008, doc. 26 at 4 ¶ 19, Plaintiff would not have received a second SL on June 23, 2008, and would have likely been discharged by June 2008.  In short, Plaintiff's retaliation claim for the alleged SL she received in January 2008 fails.

**D.    ADA**

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees."  42 U.S.C. § 12112(a).  In order to establish

a prima facie case, Plaintiff must show that she:  "(1) had, or was perceived to have, a 'disability;' (2) was a 'qualified' individual; and (3) was discriminated against because of her disability."  *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004) (citation omitted).  The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  To show that she is limited in the major life activity of working, Plaintiff must demonstrate that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  29 C.F.R. § 1630.2(j)(e)(I); *Carruthers*, 357 F.3d at 1216, citing *Sutton v. United Air Lines, Inc.* 527 U.S. 471, 491 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.").  "[A]n impairment must preclude - or at least be perceived to preclude - an individual from more than one type of job, even if the job foreclosed is the individual's job of choice."  *Carruthers*, 357 F.3d at 1216 (citation omitted).  An employer unlawfully discriminates against an individual with a disability by "not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a

disability." 42 U.S.C. §12112(5)(A).

Plaintiff contends that "her disability is anxiety and stress that causes her

inability to work," that her former supervisor, Coleman, caused her stress, and that

Defendant denied her a reasonable accommodation when it rejected her request for

a transfer to another team. Doc. 29 at 41. Interestingly, Plaintiff cites only to her

affidavit, doc. 29 at 42, a letter informing Plaintiff of a "mandatory meeting" with

the Jefferson County Department of Human Resources, doc. 27 at 5, and a form

requesting FMLA leave in December 2007 and acknowledging that Plaintiff

received her FMLA2 rights poster on July 8, 2008, doc. 27 at 20, to support her

contention that she suffered from disabling stress and anxiety and that Defendant

denied her an accommodation.[15] Specifically, Plaintiff's affidavit states the

following:

> On or about September 3, 2008, I met with [Wadley] and explained to
> [Wadley] that I had spoken with [Coleman] about not discussing my
> personal business, which I had talked to her in confidence, among my
> co-workers and the stress she was causing me and how I felt I was in
> a hostile environment. [Wadley] recommended that I call Employee
> Assistance Program (EAP). I advised [Wadley] that I had already
> contacted EAP and had an appointment in the near future. [Wadley]
> advised me that he would not be able to transfer me to a different

---

[15]Contrary to Plaintiff's contention, she did not submit documentation from a physician
certifying her disability.

> team.  He never asked me to provide a letter requesting
> accommodation or medical records.  He denied my request.

Doc. 26 at 6, ¶27.  Then again, on September 16, 2008, Plaintiff spoke to Wadley

in the presence of Coleman and reiterated that Coleman discussed Plaintiff's

personal business on the floor, causing her increased stress, and that Plaintiff felt

that she worked in a hostile environment.  *Id*. at ¶ 28.

   This court concludes that no reasonable jury could find that Plaintiff had a

disability that limited her ability to work and perform a class of jobs.  It is clear

from Plaintiff's affidavit that her "anxiety and stress" interfered only with her

ability to work with Coleman, and did not restrict her from performing a class of

jobs.  In fact, Plaintiff requested only for Defendant to remove her from Coleman's

team and never requested a change in her job or position.  Moreover, there is no

evidence in the record that Plaintiff did not perform her job satisfactorily.  To the

contrary, even Plaintiff acknowledges that Wadley "did not have issues with her

performance," doc. 26 at 6, ¶28, an assertion supported by the fact that all of

Plaintiff's disciplinary actions were attendance related rather than performance

based.  In other words, Plaintiff is not disabled under the ADA since she could

perform her job despite the stress Coleman purportedly created.  *See McKenzie v.*

*City & Cnty. of Denver*, 414 F.3d 1266, 1276 (10th Cir. 2005) (citations omitted)

("[T]he major life activity of working cannot be 'substantially impaired' if a plaintiff cannot work under a certain supervisor because of the stress and anxiety it causes."). Because Plaintiff failed to show that she is disabled, she cannot establish a prima facie case of discrimination.[16] Therefore, summary judgment is granted on the ADA claim.

## V.  CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment on all claims is due to be **GRANTED**.  A separate order consistent with this Memorandum Opinion will be entered contemporaneously.

Done the 30th day of March, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[16]Because Plaintiff failed to establish the first prong of a prima facie case, i.e., that she has a disability that limits her ability to work, this court declines to address whether Defendant denied her a reasonable accommodation.